**Deborah RIZZO–PUCCIO, Plaintiff,**

v.

**COLLEGE AUXILIARY SERVICES, INC., William F. Long, III, State University of New York and Johanna D'Aleo, Defendants.**

**No. 98–CV–0741.**

United States District Court, N.D. New York.

Oct. 8, 1999.

Office of Richard B. Wolf, Hyde Park, NY, for Plaintiff. Richard B. Wolf, of counsel.

Nixon, Peabody Law Firm, Albany, NY, for Defendants College Auxiliary Services, Inc., William F. Long, III, and Johanna D'Aleo. Sheri Littlefield–Moreno, of counsel.

Office of the Attorney General, Albany, NY, for Defendants State University of New York and Johanna D'Aleo. Gerald W. Connolly, of Counsel.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

Plaintiff Deborah Rizzo–Puccio commenced the instant litigation pursuant to 42 U.S.C. § 2000e, *et seq.*, and N.Y. Exec. Law § 296 alleging that: (1) she was the victim of a hostile work environment based on her gender; (2) Defendants retaliated against her for engaging in protected activity; and (3) Defendants violated her due process and contractually protected rights. Presently before the Court are Defendants' Motions for Summary Judgment pursuant to Fed. R. Civ. P. 56 seeking dismissal of the Complaint in its entirety.

## I. BACKGROUND

Because this is a motion for summary judgment by Defendants, the following facts are presented in the light most favorable to Plaintiff. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Plaintiff was employed by Defendant College Auxiliary Services, Inc. ("CAS") from April 11, 1983 through October 6, 1997 as Bookstore Director on the State University of New York ("SUNY") New Paltz campus.

### A. Plaintiff's Relationship With Supervisor Long

In September 1995, Defendant William F. Long, III ("Long") began working as Executive Director for CAS. As such, Long was Plaintiff's supervisor.

In or about early 1996, approximately six months after Long began working at CAS, Plaintiff contacted James Grant, then President of CAS, about a problem she was having with the SUNY faculty. Plaintiff prepared a list for Long believing it to be for information purposes only. Long, however, distributed the list to the faculty. For whatever reasons, the list caused incensed faculty members to come to the bookstore. Plaintiff told Grant that she had a problem with Long distributing the list, that the distribution had created a problem with the faculty, and asked Grant for assistance in remedying the situation. At deposition, Plaintiff also contended that she complained to Grant that Long treated her differently on account of her gender.

According to Plaintiff, Grant discussed the matter with Long. In response, Long is alleged to have told Plaintiff that he did not appreciate her going over his head to Grant and that she should not do that again. Long made no mention of any allegations of gender-based discrimination. Plaintiff responded that there was a problem with the faculty and, because Long was unavailable at the time, she opted to discuss the problem with his superior, Grant.

In or about June 1997, Plaintiff again complained to Grant about Long. Plaintiff purportedly told Grant that she was not happy with the way Long was treating her, that she felt Long was treating her differently because of her gender, and that she was being treated more harshly than her male counterparts. Plaintiff specifically advised Grant that Long frequently was rude to her, that he would hang up on her during telephone conversations, and that he treated her harshly if she was late to staff meetings. According to Plaintiff, Long treated her this way at least monthly.

At deposition, Plaintiff supplemented the bases for hostile work environment claim. Plaintiff recounted one incident when Long asked her for certain information. Plaintiff told Long that she already provided him with the information, but he insisted that she did not and that she should send it right away. This apparently upset Plaintiff.

In another instance, Plaintiff told Long about a faculty orientation meeting to which she was invited. Long inquired why

he was not invited. Long allegedly stated that he was going to go anyway and hung up the phone.

Plaintiff relayed another incident when Long said something to her in front of everybody at a staff meeting about being late. According to Plaintiff, Long never said anything to her male counterparts when they were late. Plaintiff alleges that, after the meeting, Long telephoned her and told her that she was habitually late and that she had to be on time.

Plaintiff also alleges that Long and Andy Angstrom, another CAS employee, would discuss hunting before staff meeting. Plaintiff apparently asked them to stop talking about that subject and, in response, they allegedly laughed.

Finally, Plaintiff alleges that Plaintiff cut her off at a staff meeting, saying words to the effect of "that will be enough." According to Plaintiff, other females were similarly treated in a harsh, rude manner.

In late July 1997, Defendant D'Aleo was appointed to succeed Grant as SUNY's Vice–President of Administration and President of CAS. During the selection process, Long is purported to have stated to the CAS managers that he did not think a woman was right for the job.

In or about August 1997, in response to Long's request for a salary increase, D'Aleo approached Plaintiff and the other unit managers regarding Long's performance. Plaintiff allegedly responded that she felt she worked in a hostile work environment, that she was treated more harshly than male managers, that she was being treated differently on account of her gender, and that she was not happy with the way Long handled the Magnus/Kovacs situation, *see* discussion *infra* at 53–54.[1] D'Aleo, however, did not follow up on Plaintiff's statements.

## B. Alleged Incidents of Sexual Harassment by Bookstore Employees Under Plaintiff's Supervision

As Bookstore Director, Plaintiff was responsible for supervising bookstore employees, including Jennifer Magnus ("Magnus"), Michael Kovacs ("Kovacs"), and Amanda Bracero ("Bracero").

Sometime prior to September 1995, Bracero complained to Plaintiff that Kovacs hugged her and that she did not wish to be hugged. In response, Plaintiff promptly spoke to both individuals about the incident and told Kovacs not to hug Bracero. Plaintiff followed-up on the situation to ensure that there were no further incidents of unwanted touching. Plaintiff did not prepare any written documentation of this incident.

At deposition, Magnus stated that, in March 1996, Kovacs hugged her, grabbed her buttocks, and would not let her go. According to Magnus, she personally reported this incident to Plaintiff. This incident also is supported by a memorandum prepared by CAS employee Vicky Terwilliger outlining the incidents of alleged sexual harassment of Magnus by Kovacs. *See* discussion *infra* at 53. Plaintiff, however, denies that she was ever apprised of this incident.

In November 1996, Magnus complained to Plaintiff that she was having personality problems with Kovacs and that he was unwilling to work with her. Plaintiff addressed the matter with Kovacs telling him that he needed to work with Magnus in a professional manner. According to Plaintiff, Magnus advised that she was satisfied with the resolution of the issue. Plaintiff reported this incident to Long.

In or about April 1997, Magnus complained to Plaintiff that Kovacs gave her a birthday gift consisting of a two-piece lin-

---

1. As will be discussed *infra*, Long terminated a long-time employee, Kovacs, based on allegations by Magnus that Kovacs sexually ha-

rassed her on multiple occasions. Plaintiff apparently was unhappy with Long's decision to terminate Kovacs.

gerie set[2] and a card and stated that she did not feel comfortable receiving gifts from him. Plaintiff advised Magnus to return the gift to Kovacs and tell him that she did not feel comfortable receiving gifts from him. Plaintiff did not discuss this incident with Kovacs, nor did she report it to Long or otherwise document it.

In August 1997, Nancy Richardson ("Richardson"), a CAS employee, reported to Plaintiff that Kovacs hugged Magnus against her will.[3] Shortly thereafter, Magnus reported that Kovacs hugged her against her will. Plaintiff talked with Kovacs and told him that he should not engage in such behavior. Plaintiff also told Magnus that she should report the incident to Long. After Magnus responded that she did not wish to take the matter to Long, Plaintiff reported the incident to Long.

At deposition, Magnus stated that Kovacs made constant comments to her, and otherwise looked and leered at her in a manner that made her feel uncomfortable. According to Magnus, Kovacs acted toward her in either an inappropriate sexual or hostile manner almost every day. Other than that previously discussed, Plaintiff denies having knowledge of such alleged inappropriate behavior by Kovacs.

In August 1997, a temporary employee, Brenda Stisi, reported to Plaintiff that Kovacs made an inappropriate statement to her. Kovacs allegedly told Stisi that if she was not having a good time inside the bookstore, she should come out and he would show her a good time. Plaintiff reported this incident to Long.

Also in August 1997, Magnus spoke with Vicky Terwilliger about the problems she was having with Kovacs. Terwilliger prepared a memorandum listing Magnus's allegations against Kovacs (the "Terwilliger memorandum"), and provided it to Long.

Long advised Plaintiff that she should have informed him about all of the complaints made by Magnus about Kovacs. Plaintiff admitted that she failed to report the birthday gift incident.

Long then investigated Kovacs's conduct towards Magnus. Long met with Magnus, Richardson, Plaintiff, Harold Kearns, Bruce DuBois, and Kovacs. Magnus confirmed all the allegations in the Terwilliger memorandum. Magnus also stated that she had reported the March 1996 incident to Plaintiff, and that Plaintiff responded by saying that Kovacs should be kept away from Magnus, and that Magnus should stay out of the storeroom where Kovacs worked.

Richardson told Long that she witnessed Kovacs act in a sexually inappropriate manner towards Magnus by hugging her against her will, looking Magnus "up and down," and making suggestive noises towards Magnus. Richardson also stated in her affidavit that she reported Kovacs's behavior towards Magnus to Plaintiff on several occasions over an approximate 1½ year period.

DuBois and Kearns advised Long that they had not witnessed any of the instances listed on the Terwilliger memorandum.

### C. Long Terminates Kovacs

On or about August 23, 1997, Long advised Plaintiff that he intended to terminate Kovacs's employment on account of the allegations of sexual harassment. Plaintiff urged Long to send Kovacs for counseling or training on sexual harassment, rather than terminate an employee of eight years.

Long met with Kovacs who denied the allegations of sexual harassment. In light of the allegations of sexual harassment, however, Long advised Kovacs that he would be terminated, but afforded Kovacs

---

2. Plaintiff described the gift as a "short set."

3. According to Richardson, she informed Plaintiff on several occasions over an approximate 1½ year period of Magnus' complaints about Kovacs including unwanted touching, leering, sexually suggestive comments and noises, and his refusal to speak to Magnus.

the opportunity to resign instead. Kovacs resigned.

As previously discussed, on or about August 22, 1997, in response to D'Aleo's investigation into Long's request for a raise, Plaintiff objected to the way Long handled the Magnus–Kovacs incident and allegedly also complained that she was being treated differently and in a hostile manner on account of her gender.

### D. Long Terminates Plaintiff

On September 2, 1997, Long drafted a memorandum to Plaintiff that read, in part, as follows:

> This is to notify you that effective December 18, 1997 your employment may terminate with College Auxiliary Services, Inc. You have the option of submitting your resignation.
>
> I will allow reasonable time for you to take time off for interviews.
>
> You are still expected to perform to my expectations and, if these expectations are not met, termination will occur before the above date.

That same day, Long met with Plaintiff and Craig Haight, Director of Human Resources at SUNY New Paltz. Long handed Plaintiff the memorandum and told her that, in light of the Magnus–Kovacs situation, she would be terminated effective December 18. Plaintiff pleaded with Long to reconsider his decision, claiming that she did not violate any policy and that she had performed well for the company for fourteen years. Long refused to change his decision. Haight concurred with Long's decision.

Shortly thereafter, Plaintiff asked D'Aleo to rescind the September 2 letter and reinstate her to her position. D'Aleo declined to do so.

On September 9, 1997, Plaintiff wrote a letter to Long responding to his September 2 memorandum. Plaintiff's letter read as follows:

> I am responding to your Memorandum to me dated September 2, 1997 . . . .

> Your memo states that, after 14 years on the job, I "may" be terminated on December 18, 1997. The memo is unclear by you as to whether you have terminated me or not effective December 18, 1997.

> Regardless of the vagueness of your memo, it is extremely upsetting to me because it implied that I am not doing my job properly. This is not so. I have in the past performed and continue to perform my work effectively and with distinction.

> I have good reason to believe your September 2 memo and your actions toward me are based on your improper effort to retaliate against me because of my appropriate handling and reporting to you about an alleged sexual harassment matter concerning a female employee in the Bookstore, and your attitude toward women which I have observed. I do not intend to let such improper action and related behavior by you go unremedied.

> I want to maintain a productive professional relationship with you . . . I therefore ask that you do not further undermine my efforts by actions such as your September 2 memo. I further request that you rescind that memo and have it removed from all files in which it has been placed.

On or about September 9, 1997, Plaintiff met with Long, DuBois, and Kearns about Plaintiff's September 9 letter. At that meeting, Long told Plaintiff that he felt her letter was unprofessional and that he was unhappy about it.

D'Aleo and Haight also called Plaintiff to a meeting to discuss the September 9 letter. Plaintiff, however, stated that she could not attend because of a doctor's appointment. The meeting was not rescheduled.

By memorandum to Plaintiff dated September 17, 1997, Long wrote that Plaintiff's "memo and not meeting with the President of the Corporation were not ex-

amples of professionalism." The memorandum further stated that:

> In light of recent actions such as; refusing to meet with Johanna D'Aleo, not putting CONFIDENTIAL on your [September 9] memo to me (my secretary opened and read it), making unsubstantiated allegations against me, and asking an hourly employee into the [prior] meeting, I am concerned. The only people that I appraised [sic] as to what was happening were the President of the Corporation, the Human Resources Director, and the Assistant Director of CAS. By bringing in Harold Kearns and Christel Todd, my secretary, into the process, you have made this a public matter when it could have been handled more privately.

On September 19, 1997, Plaintiff responded writing, in part, that:

> Your memo appears to be part of your continuing effort to undermine me in my job and your retaliation against me for engaging in activities aimed at preventing discrimination, which I am told are protected by law.... I have and will continue to perform my job in a professional way despite your efforts against me. Your statements in your memo about certain other matters I only note are incorrect and distorted by you for reasons that you know best....
>
> Without consulting me, you placed an advertisement dated September 9, 1997, for an "Assistant Director" to work under me.... [I]f you believed in good faith there might be a need, not only courtesy, but sound and obvious professional practice would have dictated that you talk about the matter first with me. I strongly suspect you are not proceeding in good faith by going forward in this matter as you have in order to place me in a bad light and to further retaliate against me.
>
> I therefore ask that I sit in with you ... in any interviews of candidates for the position so that I can participate in the hiring process. This certainly makes

common sense ... since that person will be working closely with me and under my direction.

By Memorandum dated October 6, 1997, Long wrote to Plaintiff stating:

> Effective today, 10/6/97, your employment with [CAS] is terminated. You will receive two weeks severance and any other benefits you have accrued.

On December 18, 1997, Plaintiff filed a charge of retaliation and sexual discrimination with the Equal Employment Opportunity Commission. On May 6, 1998, Plaintiff commenced the instant litigations pursuant to 42 U.S.C. § 2000e and N.Y. Exec. Law § 296 claiming that she was the victim of a hostile work environment and that she was retaliated against for having engaged in protected activity. Plaintiff further alleged that Defendants deprived her of her due process and contractually guaranteed rights.

## II. DISCUSSION

### A. Summary Judgment Standard

Presently before the Court are Defendants' motions for summary judgment pursuant to FED. R. CIV. P. 56.

The standard for summary judgment in employment discrimination cases is well-settled and need not be restated here. This Court has set forth the appropriate standard to be applied in numerous published decisions, *see Roman v. Cornell Univ.*, 53 F.Supp.2d 223, 232–33 (N.D.N.Y. 1999); *Phipps v. New York State Dep't of Labor*, 53 F.Supp.2d 551 (N.D.N.Y. June 24, 1999); *Riley v. Town of Bethlehem*, 44 F.Supp.2d 451, 458 (N.D.N.Y.1999), and will apply the same standard discussed in those cases to Defendants' motions for summary judgment.

### B. Hostile Work Environment

■ Title VII is violated when sexual harassment is so severe or pervasive as to alter the conditions of the Plaintiff's employment and create an abusive working

56

environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986)); *Brennan v. Metropolitan Opera Ass'n, Inc.*, 193 F.3d 310 (2d Cir.1999); *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 436 (2d Cir.1999). "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor*, 106 S.Ct. at 2405; *see also Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir.1999).

To be actionable, "[t]he conduct alleged must be severe and pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *see also Faragher*, 118 S.Ct. at 2283; *Brennan*, 192 F.3d at 318. In determining whether an environment is sufficiently hostile or abusive, courts examine the totality of the circumstances, *see Richardson*, 180 F.3d at 437, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) and what psychological harm, if any, resulted. *Faragher*, 118 S.Ct. at 2283; *Richardson*, 180 F.3d at 437.

"Simple teasing, offhand comments, and isolated incidents (unless extremely serious), will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal citations and quotations omitted); *See also Richardson*, 180 F.3d at 437. "In order to meet [her] burden, the plaintiff must show 'more than a few isolated incidents of [gender-based] enmity,' 'there must be a steady barrage of opprobrious [gender-based] comments,' evidence solely of 'sporadic [gender-based] slurs' does not

suffice." *Williams*, 171 F.3d at 100 (quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986); *Schwapp*, 118 F.3d at 110); *see also Brennan*, 192 F.3d, at 319; *Richardson*, 180 F.3d at 437. Title VII is not to be used as "a general civility code," but is actionable only for conduct sufficiently "extreme to amount to a change in the terms and conditions of employment." *Williams*, 171 F.3d at 100. Pervasiveness and severity are independent and equal grounds on which to support violations of Title VII. *See Faragher*, 118 S.Ct. at 2283 (extremely serious isolated incidents may be actionable); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (there must be conduct that is "sufficiently severe or pervasive"); *see also Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 188, 142 L.Ed.2d 153 (1998); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998); *Tomka*, 66 F.3d at 1305; *Torres v. Pisano*, 116 F.3d 625, 631 n. 4 (2d Cir.), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997).

"A plaintiff must also demonstrate that she was subjected to the hostility because of membership in a protected class. In other words, an environment which is equally harsh for both men and women ... does not constitute a hostile working environment under the civil rights statutes." *Brennan*, 192 F.3d, at 318.

Here, Plaintiff complains that she and other women were subjected to frequent hostility, rudeness, and a degrading attitude, but that men were not. According to Plaintiff, this is evidenced by the above-discussed incidents whereby Long: (1) hung-up on Plaintiff; (2) scolded Plaintiff in front of the staff for being late to a meeting; (3) was hostile toward Plaintiff when he was informed that he was not invited to a faculty orientation meeting; (4) distributed to the faculty a list purportedly prepared for information purposes

only; (5) was hostile toward Plaintiff when he called her for certain information that Plaintiff allegedly already provided, but which Long insisted he had not received; (6) laughed at Plaintiff when she asked him to stop talking about hunting; (7) cut her off while she was speaking at a staff meeting; (8) stated that a woman could not perform the job of Vice President of Administration of SUNY New Paltz; and (9) was generally rude and hostile towards her and treated her differently than her male counterparts.

### 1. Whether Long's Conduct was Gender–Based

■ Although Long may not have been a candidate for a congeniality award, there is a dearth of evidence from which a fair-minded trier of fact reasonably could conclude that Long's actions were gender-based. The specific acts complained of, general hostility and rudeness, do not indicate that Long acted because of Plaintiff's gender. In other words, Long's actions are not of the type that would readily lead one to conclude that they were done because of Plaintiff's gender. In fact, Plaintiff admits that Long never used inappropriate gender-based language, never made inappropriate gender-based comments, never used profanity, and never physically touched her or threatened her. The only gender-based comment to which Plaintiff is able to point is Long's alleged statement that a woman could not perform the job of Vice President of Administration. Of course, this comment was not directed at Plaintiff, but at Long's supervisor, D'Aleo. None of Long's conduct reasonably can be linked to Plaintiff's gender.

Although Plaintiff alleges that Long did not similarly treat men in a harsh and rude manner, these allegations are largely unsubstantiated. Plaintiff testified at deposition that when male employees came in late to staff meetings, they were not reprimanded, while she was. However, Plaintiff further testified that male employees would be reprimanded for coming late, but just "[n]ot like I was when I came in late." Aside from this one instance, Plaintiff makes general and conclusory allegations that she was treated more harshly. Plaintiff offers no other evidence from other employees, male or female, that Long treated women differently than men.

■ Instead, in her deposition, Plaintiff recounts instances when other female employees allegedly told her that Long had treated them poorly. Defendants object to the use of this evidence on hearsay grounds. Indeed, a motion for summary judgment, or opposition thereto, must be based upon evidence that "would be admissible in evidence." FED. R. CIV. P. 56; *see Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160; *AD/SAT Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 236 (2d Cir.1999) (stating that a party may not rely upon inadmissible hearsay in opposing a motion for summary judgment); *see also, Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir.1999). Because Plaintiff's deposition testimony as to what she was told is hearsay that would be inadmissible at trial, it will not be considered by the Court in connection with the pending motions. *See Sarno*, 183 F.3d at 160. Without sworn statements from these other employees stating what they said, Plaintiff has failed to adduce sufficient evidence demonstrating that Long was rude to other women in the office and that he did not treat male employees in a similar fashion. *Id.*

Defendant, however, offered the deposition testimony of Christel Todd, a CAS employee, who testified that she observed Long being "strong or short" with men, including Bruce DuBois and Andy Angtstrom. Viewing the evidence as a whole, the Court finds that no fair-minded jury could reasonably conclude that Long's actions her based on gender.

### 2. Severity or Pervasiveness of Alleged Discrimination

■ Even assuming Long's actions were gender-based, no fairminded jury

could reasonably conclude that Long's conduct was sufficiently severe or pervasive to constitute a hostile work environment.

As noted, Plaintiff initially indicated that Long treated her rudely eighty percent of the time. However, when asked whether she was treated this way on "a weekly basis, a daily basis, [or] a monthly basis," Plaintiff answered that this occurred on an "[a]t least monthly" basis. Furthermore, Plaintiff related only isolated incidents of alleged hostile, rude, or demeaning behavior by Long. Although Plaintiff is not required to present a list of specific acts, *Brennan,* 192 F.3d, at 318, she has failed to proffer sufficient evidence from which a fair-minded jury reasonably could conclude that Long's alleged discriminatory conduct occurred on a frequent basis. *See Torres,* 116 F.3d at 631. For example, Plaintiff has failed to submit any evidence, such as statements from co-workers, confirming her allegations of constant harassment. *See Brennan,* 192 F.3d, at 318; *Torres,* 116 F.3d at 631. Thus, there is insufficient evidence that any alleged discriminatory conduct occurred with any frequency.

While Plaintiff may have subjectively believed Long's conduct to be severe, no reasonable jury could find that his conduct was objectively severe. *See Richardson,* 180 F.3d at 436. Again, the complained of conduct consists of isolated reprimands for coming to a meeting late or allegedly not supplying requested information, hanging up the phone in an abrupt manner, stopping her mid-sentence while she was speaking, and other like conduct. While Long's conduct may have been rude or impolite, it is not severe. Long never used profanity, he never used inappropriate sexual language, he never made rude or offensive comments about Plaintiff's gender or appearances, he never made rude or offensive sexual gestures, and he never physically threatened her. At most, Long did not treat Plaintiff as she would like to have been treated, and this upset her. Plaintiff's subjective disappointment in Long's treatment of her, however, does not automati-

cally give rise to a claim under Title VII. Plaintiff's allegations go to more of the "civility" type of conduct that Title VII does not protect, rather than protected gender-based discrimination.

Moreover, there is no evidence indicating that Long's conduct unreasonably interfered with her work. At most, the evidence indicates that Long was, perhaps, temperamental and would take out his emotions on employees, but there is no indication this interfered with Plaintiff's ability to perform her work. Long's reprimanding Plaintiff for coming late to a meeting is not an unreasonable interference with Plaintiff's job, but part of his duties as her supervisor. The fact that Long telephoned Plaintiff after the staff meeting and told her that she had to stop being habitually late to meetings suggests that Long honestly believed Plaintiff to be routinely late and, thus, warranted a reprimand.

Finally, there is no evidence of any resultant psychological harm. The only evidence is Plaintiff's testimony that she was upset by Long's behavior. Plaintiff provides no proof corroborating this or detailing the extent to which she was upset.

For these reasons, no fair-minded jury could reasonably conclude that Plaintiff was the victim of a hostile work environment. Accordingly, Plaintiff's hostile work environment claim is dismissed.

## C. Retaliation

Plaintiff next asserts that Defendants terminated her in retaliation for complaining that Long was treating her in a harsh, hostile, demeaning, and rude manner on account of her sex. Retaliation claims pursuant to 42 U.S.C. § 2000e–3 are subject to the familiar *McDonnell Douglas* burden shifting analysis. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In brief, the plaintiff must initially satisfy her *de minimis* burden of demonstrating a *prima facie* case of retaliation.

*See Richardson,* 180 F.3d at 443. If the plaintiff does so, the defendant then has the burden of proffering a legitimate, non-retaliatory reason for the complained of action. *See id.* If the defendant meets this burden, any presumption of retaliation drops from the case, and plaintiff must "demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." *Id.*

### 1. The *Prima Facie* Case

■ To establish a *prima facie* case of retaliation, plaintiff must demonstrate that the employee was engaged in protected activity, that the employer was aware of that activity, that the employee suffered adverse employment decisions, and that there was a causal connection between the protected activity and the adverse employment action. *See Richardson,* 180 F.3d at 443; *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998); *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).

### a. Participation in a Protected Activity Known to Defendant

■ Whether Plaintiff participated in protected activity is an issue the parties debate. Plaintiff offers the following incidents of claimed protected activity: (1) she reported to Grant in early 1996 that Long was treating her differently on account of her gender; (2) she reported to Grant in the summer of 1997 that Long was treating her differently on account of her gender and that she was being subjected to a hostile work environment; (3) she reported to D'Aleo in August 1997 that Long was treating her differently on account of her gender and she was subjected to a hostile work environment; and (4) Plaintiff wrote to Long letters dated September 9 and September 19 complaining that he was retaliating against her because she was a woman and because she tried to resolve

issues of sexual harassment in the bookstore. Defendants deny that Plaintiff reported to Grant or D'Aleo that she felt she was being discriminated against on account of her gender.

In light of this classic "he said, she said" situation, the Court finds that a triable issue of fact remains whether Plaintiff's discussions with Grant in 1996 and 1997, and her conversation with D'Aleo in August 1997 constituted protected activity. For example, it is unclear whether Plaintiff actually complained to D'Aleo in late August of sex discrimination, or whether she only complained about Long's handling of the Magnus/Kovacs situation. Thus, a jury must determine whether Plaintiff did, in fact, complain of sex discrimination at these times. For purposes of the ensuing discussion, however, the Court will assume that Plaintiff did complain of sex discrimination to Grant and D'Aleo.

It also is questionable whether Plaintiff's September 9 and 19th letters accusing Long of engaging in unlawful retaliation constitute protected activity. For purposes of the motion for summary judgment, the Court will assume that it is protected activity.

### b. Whether Defendants Were Aware of the Protected Activity

Defendants claim that Long was not made aware of Plaintiff's alleged complaints of sex discrimination until after he made his decision to terminate her and, therefore, Plaintiff cannot establish a *prima facie* case of retaliation.

This prong, however, is not as narrowly defined as Defendants would have it. Plaintiff allegedly complained of sex discrimination to Grant and/or D'Aleo. D'Aleo, a Defendant herein, was involved in the decision to terminate Plaintiff. She discussed terminating Plaintiff with Long and she reviewed and approved Long's September 2 termination memorandum. Accordingly, a reasonable jury could find that Defendants were aware of Plaintiff's alleged complaints of sex discrimination.

Further, Long was certainly aware of the allegations of discrimination contained in Plaintiff's September 9 and 19th letters at the time he moved up her separation date.

### c. Adverse Employment Action

There is no dispute that Plaintiff suffered an adverse employment action—she was fired.

### d. Causal Connection

■ Defendants next assert that there is no causal connection between Plaintiff's termination and her alleged complaints of sex discrimination. First, Defendants contend that Plaintiff cannot rely on the timing of her purported complaints because they are too remote. Specifically, Defendants argue that she alleges to have complained about gender discrimination over a 1½ year period prior to her termination. Second, Defendants maintain that there is no evidence of disparate treatment; that is, that there are no other instances whereby a CAS employee was terminated for failing to properly address and report allegations of sexual harassment. Third, Defendants argue that Plaintiff offers no direct or circumstantial proof of retaliatory animus directed against her.[4]

In response, Plaintiff argues solely that the causal connection is satisfied by the temporal proximity between her complaints to Grant in June or July of 1997 and to D'Aleo in August 1997 and her subsequent receipt of a termination letter on September 2, 1997.

■ "A causal connection may be established either 'indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.'" *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (quoting *DeCintio v. Westchester County of Medical Center,* 821 F.2d 111, 115, *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)); *see also Quinn,* 159 F.3d at 769; *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). Mere temporal proximity alone will not necessarily satisfy this requirement. *See Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990) (3 months time period between protected activity and adverse action did not satisfy causal connection); *see also, Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999); *Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 399 (7th Cir.1999).

Here, Plaintiff is alleged to have first complained to Long's superiors in 1996 and last in late August 1997. She was terminated on September 2, 1997. On its face, the proximity between the alleged late August complaint and the September 2 firing would tend to support the requisite causal connection. The timing of these latter incidents, however, cannot be viewed in a vacuum. The fact that Plaintiff allegedly complained on two prior occasions over a 1½ year period without repercussion would tend to suggest that she was not retaliated against. Furthermore, as previously noted, it is not at all clear that Plaintiff ever complained about sexual discrimination against her in late August, but rather about the way Long handled the Magnus/Kovacs situation and, in particular, the firing of Kovacs.

While the Court believes the requisite causal connection in this matter to be tenuous at best, drawing all reasonable infer-

---

4. In support of their argument, Defendants cite to the unpublished decision in *Philippeaux v. Fashion Inst. Of Tech.,* 104 F.3d 356, 1996 WL 734038 (2d Cir.1996). Rule 0.23 of the Second Circuit expressly states that because summary orders "do not constitute formal opinions of the court and are unreported or not uniformly available to all parties, they shall not be cited or otherwise used in unrelated cases before this or any other court." Defendants have clearly violated this rule and are instructed to abide by Second Circuit rules in the future. Defendants should have found reported decisions supporting their claim, which can readily accomplished through diligent legal research.

ence in favor of Plaintiff, the Court finds that a jury could reasonably find a causal connection between the claimed protected activity and the adverse action.

 Assuming Plaintiff has proffered sufficient evidence upon which a jury could find that she established a *prima facie* case of retaliation, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for their actions.

Defendants assert that they terminated Plaintiff because they believed she had improperly handled incidents and allegations of sexual harassment in the workplace over a significant period of time and she had fostered an unsafe environment in failing to appropriately deal with such incidents and allegations. This is a legitimate, nondiscriminatory reason. Accordingly, the onus reverts to Plaintiff to proffer sufficient evidence from which a jury could reasonably conclude by a preponderance of the evidence that the reason proffered by Defendants was a pretext for prohibited retaliation.

Plaintiff asserts several bases challenging Defendants reasons for terminating her. First, she claims Long's September 2 memorandum is inaccurate in that it claimed that Plaintiff failed to report to him allegations of sexual harassment for at least two years. According to Plaintiff, it was actually only a one and one-half year period. Defendants respond that whether the time-frame was actually two years or one and one-half is irrelevant, and that what is relevant is that Plaintiff failed to report ongoing incidents of sexual harassment in the bookstore. The Court agrees with Defendants that whether Plaintiff failed to report instances of sexual harassment in the bookstore during a two year period or a one and one-half year period is immaterial.

Second, Plaintiff claims that Long's investigation into Magnus's allegations was ineffectual. According to Plaintiff, "[o]f the five persons Long spoke to ... four could not support [Magnus's] claims." Plaintiff continues to state that:

> if [Long's investigation was] done in good faith, it would have led most observers to conclude that the events either did not happen at all, or that Plaintiff should have been consulted in much greater depth, or that more people should have been interviewed. Instead it was enough for Long, he claims, to have "lost trust" in a manager highly rated for 14 years, praised by Long two months earlier, and sufficient to fire her, notwithstanding his strong evaluation of her problem solving, her exemplary record generally and her demonstrated effectiveness in dealing with allegations of sexual harassment in the past.

Defendants respond that Long conducted an adequate investigation that led him to reasonably believe that Plaintiff mishandled allegations of sexual harassment and allowed the bookstore to remain unsafe for an extended period of time. According to Defendants, Long's investigation included questioning Magnus, who confirmed all her allegations against Kovacs, and questioning Richardson who stated that she personally witnessed Kovacs sexually harass Magnus and other females on numerous occasions, and that she personally advised Plaintiff on several occasions over an approximate one and one-half year period of the complaints of Kovacs's behavior. Defendants further assert that Plaintiff's prior evaluations are irrelevant because it was not until these numerous allegations of sexual harassment by Kovacs came to a head that Long lost trust in Plaintiff. Defendants state that:

> Long terminated [P]laintiff for mishandling Ms. Magnus'[s] complaints, which he first became aware of following her performance review. Clearly, Mr. Long's change in opinion of the [P]laintiff's judgment after learning of such a serious personnel error cannot be seen as support for [P]laintiff's pretext argument.

Third, Plaintiff asserts that Long's basis for moving up Plaintiff's termination date is "ludicrous and not worthy of belief." It will be recalled that Long wrote Plaintiff asserting that she acted in an unprofessional manner by writing him a letter that she failed to mark confidential and, as a result, his secretary opened and read her letter; refusing to meet with D'Aleo; making unsubstantiated allegations against him; and asking an hourly employee to attend their meeting. Defendants respond that Plaintiff had already been terminated by this time, and that Long merely decided to move up the termination date on account of Plaintiff's actions.

In short, Plaintiff argues that "[o]ne would assume under these facts [that] Long would have zealously tried to support Plaintiff, not terminate her, except for the fact that at this time Plaintiff was complaining against Long because of his debasing treatment of her as a female and her complaints about it, as well as Long's shoddy handling of the Title VII investigation of Magnus and Kovacs."

Having reviewed the evidence in its totality, the Court finds that there is little, if any, evidence in this case suggesting that Plaintiff was retaliated against for having complained of gender discrimination. As previously discussed, Plaintiff's *prima facie* case is tenuous at best. While there is proof that D'Aleo and, thus, CAS knew of Plaintiff's alleged complaints of gender discrimination, there is no evidence that Long, the individual who decided to terminate Plaintiff, was aware of any such complaints against him. It, thus, would not be reasonable for a jury to infer that Long decided to terminate Plaintiff because of, or in retaliation for, such complaints. The facts that Plaintiff allegedly complained to Long's superiors on prior occasions over the previous one and one-half years without repercussion tends to undermine her retaliation claim. In fact, Long gave Plaintiff a good evaluation in June 1997, after she had purportedly complained to Grant about Long. Again, such a positive review after alleged complaints of sexual discrimination tends to undermine a claim of retaliation. The only potential evidence of repercussion was in connection with the list given to the faculty, *see* discussion *supra* at 51–52, wherein Long told Plaintiff that she should not go over his head. This, however, was unrelated to allegations of sex discrimination. There simply is no evidence that Long was aware that any complaints of sexual discrimination had been made against him or that he acted against Plaintiff because of such complaints.

On top of a weak *prima facie* case, Plaintiff attacks the basis for her termination, largely relying on the fact that she worked at CAS for fourteen years with an unblemished service record. Of course, New York is an employment at will state, *see Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983), and Long could have terminated Plaintiff for any non-prohibited reason, regardless of whether she had an unblemished service record. Thus, Defendants did not have to have "cause" to fire Plaintiff, they only had to have acted for non-discriminatory, non-retaliatory reasons. *See Hill v. St. Louis Univ.*, 123 F.3d 1114, 1119 (8th Cir.1997).

The evidence indicates that Long believed that Plaintiff mishandled incidents of sexual harassment by Kovacs that persisted over a two year period. Plaintiff was aware that Kovacs was sexually harassing female bookstore employees at least as early as September 1995 and persisted doing so until August 1997, the month he was terminated by Long. Plaintiff also was aware that Kovacs and Magnus were having problems. Kovacs repeatedly harassed Magnus. Magnus complained that she received a gift of lingerie from Kovacs, that he hugged her without consent, and that they were having personality problems. Plaintiff alleges that she talked with Kovacs and told him he needed to act in a professional manner, but that Kovacs denied engaging

in sexual harassment. There is no evidence that Plaintiff took any effective disciplinary action against Kovacs, required him to attend counseling or training for workplace sexual harassment, documented the incidents in Kovacs's personnel record, or otherwise undertook any effective actions to stop Kovacs from sexually harassing bookstore employees and others.

The situation peaked when Long was provided with the Terwilliger memorandum that outlined all the alleged acts of sexual discrimination committed by Kovacs against Magnus. Based upon the evidence of persistent sexual harassment by Kovacs and no apparent resolution of the matter by Plaintiff, Long reasonably could have concluded that Plaintiff did not effectively deal with sexual harassment in the workplace and that her management of the bookstore left female employees at risk. It is of no moment whether several other bookstore employees did not witness Kovacs's alleged sexual harassment of Magnus and others. Magnus's testimony of repeated inappropriate conduct, together with the eyewitness testimony of Richardson and Plaintiff's admissions that she was aware of certain allegations of sexual harassment against Kovacs, was sufficient for Long to conclude that Kovacs had indeed engaged in sexual harassment over a two year period that Plaintiff allowed to go unremedied. Thus Long terminated Plaintiff for a legitimate, non-discriminatory reason and Plaintiff's allegations that Long did not conduct an adequate investigation into the Magnus–Kovacs situation are insufficient to enable a fair-minded jury to reasonably conclude that Defendants' reason for terminating her was a pretext for unlawful retaliation. That Long was genuinely concerned with Plaintiff's handling of sexual harassment issues in the bookstore is evidenced by the September 2, 1997 termination memorandum to Plaintiff that explicitly states that until separation, "[y]ou are still expected to perform to my expectations and, if these expectations are not met, termination will occur before the above date. These expec-

tations include, but are not limited to the following: Notifying me of any potential sexual harassment issues." This is further evidenced by CAS's proposed sexual harassment policy, which has since been adopted, that states that "[i]t will be considered a form of misconduct and disciplinary action will be enforced against ... supervisory and managerial personnel who knowingly allow [sexual harassment] to continue."

While Long may have considered Plaintiff's complaint to D'Aleo about the way he handled the Magnus–Kovacs situation in his decision to fire Plaintiff, such a complaint is not protected activity under Title VII. Rather, complaining about a superior's firing an employee who was alleged to have engaged in sexual harassment, even though the underlying conduct may fall within the purview of Title VII, is more akin to insubordination which, of course, is ground for termination. Plaintiff has offered no evidence tending to suggest that Long acted because of her alleged complaints of sexual harassment. Thus, the Court finds that no fair-minded jury could reasonably conclude that Defendants fired Plaintiff in retaliation for engaging in activity protected under Title VII.

The only remaining question is whether Defendants moved up Plaintiff's termination date in retaliation for engaging in protected activity. While Plaintiff advised Long in her letters that she believed he terminated her in retaliation for her complaining about sex discrimination, her subjective beliefs do not automatically transform Long's actions into conduct prohibited by Title VII. After receiving the September 2 termination memorandum, Plaintiff drafted a letter to Long accusing him of retaliation and undermining her efforts to run the bookstore. Plaintiff requested that Long "rescind [his] memo and have it removed from all files in which it has been placed." Long responded to Plaintiff warning her of his expectations

that she act in a professional manner. Plaintiff, in turn, responded accusing Long of continuing to undermine her and retaliate against her. As a result, Long moved Plaintiff's termination date from December to October 6.

Although Plaintiff made frequent mention to Long that she believed him to be retaliating against her, Long never responded to such allegations, but, rather, expressed his belief that her letters were unprofessional. Letters by a subordinate to her superior accusing him of attempting to undermine her; attacking his handling of personnel affairs within his authority; accusing him of having an "attitude toward women;" and assailing his decision to hire an assistant director without her input [5] are acts of insubordination or, in Long's words, unprofessional conduct. These were legitimate grounds upon which Long could have accelerated Plaintiff's termination date notwithstanding her attempts to paper the file with allegations of unlawful retaliation. It must be remembered that the decision to terminate Plaintiff already had been made. Long merely moved up the termination date in response to Plaintiff's inappropriate behavior towards him.

 Indeed, an interesting situation is presented where a subordinate drafts a letter accusing her superior of unlawful retaliation among other things such as undermining their ability to work and improperly handling personnel matters. Title VII does not obligate supervisors to subject themselves to insubordination by their subordinates merely because the employee uses words such as "retaliation" or "Title VII." While Title VII protects certain rights, an employee may not use it as a sword to verbally attack her employer and similarly use it as a shield demanding immunity from disciplinary ac-

tion resulting from such inappropriate conduct toward her employer. Much like the First Amendment is not so far reaching as to protect someone from yelling fire in a crowded theater, Title VII does not protect employees from insubordination even though the employee makes reference to Title VII. An employer is well within his rights to fire someone, or move up the separation date, where, as here, the employee attacks the actions of her supervisor in firing her and handling other internal affairs.

Other than attacking Long's definition of "unprofessional conduct," and terming Long's reasons as ludicrous, Plaintiff offers no evidence that Long moved up her termination date because of protected activity. To the contrary, the evidence demonstrates that Long expedited Plaintiff's separation to remove her insubordination from the workplace, something he was justified in doing.

Accordingly, Plaintiff's Title VII claims are dismissed.

### D. Due Process & Breach of Contract Claims

 Defendants move to dismiss Plaintiff's Due Process cause of action on the ground that there was no state action. Plaintiff has failed to respond to this portion of Defendants' argument and, thus, has abandoned this claim. *See Nicholson v. Doe*, 185 F.R.D. 134, 139 (N.D.N.Y. 1999); *Frink America, Inc. v. Champion Road Mach. Ltd.*, 48 F.Supp.2d 198, 208 (N.D.N.Y.1999) (citing cases).

Moreover, the basis of Plaintiff's Due Process claim is unclear. The Complaint merely alleges that:

Defendants ... acted willfully and maliciously and contrary to the procedures of [CAS] in its Handbook in the termination of Plaintiff, and in deliberate dis-

---

**5.** It is curious why Plaintiff would question Long's decision to hire an assistant director and why she would insist on being involved in the hiring process after she had already received the September 2 termination memo-

randum. Because the decision had already been made to fire her, it was unlikely that Plaintiff would work with a new assistant director.

regard of Plaintiff's due process, Constitutional and contractually protected rights.

At no time does Plaintiff substantiate her due process claim, recite those facts that she contends would support such a claim, or even point to a statutory or constitutional provision giving rise to such a claim.

Even if the Court were to assume Plaintiff to be asserting a claim pursuant to the Fourteenth Amendment, the evidence indicates that Plaintiff was an employee of CAS, a private not-for-profit corporation, and not SUNY. Without state action, Plaintiff's Due Process claim must fail. *United States v. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO*, 156 F.3d 354, 359 (2d Cir.1998).

### E. Breach of Contract

■ Finally, Plaintiff asserts a claim for breach of contract, contending that Defendants violated the progressive discipline policy in the employee handbook. Defendants respond that Plaintiff was an at will employee and that the employee handbook containing the disciplinary process is not a contract with Plaintiff because it does not cover the terms and conditions of her employment.

■ "It is well settled [under New York law] that 'absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party.'" *Fitzgerald v. Martin–Marietta*, 256 A.D.2d 959, 681 N.Y.S.2d 895, 896 (3d Dep't 1998) (quoting *Sabetay v. Sterling Drug*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987)). Plaintiff fails to identify any express contractual agreement with Defendants concerning the terms of her employment. Thus, she is presumed to be an "at will" employee.

■ "An employee may recover, however, by establishing that the employer made the employee aware of its express written policy limiting its right of discharge and that the employee detrimentally relied on that policy in accepting the employment. Where these elements are proved, the employee in effect has a contract claim against the employer." *De Petris v. Union Settlement Ass'n, Inc.*, 86 N.Y.2d 406, 410, 633 N.Y.S.2d 274, 657 N.E.2d 269 (1995) (citing *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 465–466, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982)). "Mere existence of a written policy, without the additional elements identified in *Weiner*, does not limit an employer's right to discharge an at will employee or give rise to a legally enforceable claim by the employee against the employer." *Id.*

Here, although the Court has been presented with the disciplinary policy, there is no evidence that the requisite *Weiner* elements have been satisfied. First, there is no express written policy limiting CAS's right of immediate discharge. *See Fitzgerald*, 681 N.Y.S.2d at 896. Having reviewed the submitted portions of the personnel manual, the Court is unable to identify any sections restricting Defendants' right to immediately terminate Plaintiff at will. Section II, subsection A of the Employee Handbook is labeled "Employment at Will." The Handbook then states up front and in highlighted print that "CAS hires all people with the clear understanding that the period of employment is for an indefinite length of time, and that employment may be terminated at the will of the employee or the employer." While subsection B (Due Process & Progressive Discipline) provides for a system of progressive discipline, it does not limit the reasons for which Defendants may immediately terminate an employee. The Handbook also states that "[d]isciplinary actions by CAS may include an oral warning, a written warning, or depending upon the seriousness of the offense, immediate discharge." Subsection C (Immediate Discharge Offenses) further provides that "[s]ome types of behavior may be cause for dismissal upon first offense.

**66**

The list includes, but is not limited to ... Insubordination." It, thus, is clear that CAS did not intend to limit its ability to terminate an employee at-will.

Second, Plaintiff offers no evidence that she relied on the provisions of the Employee Handbook in accepting her employment with CAS. Moreover, the employee handbook expressly states on the first page that "[t]his Employee Handbook is not to be considered a contractual agreement. CAS must reserve the right to modify, with notice, policies and practices as needed." *See also LaDuke v. Hepburn Med. Ctr.*, 239 A.D.2d 750, 753, 657 N.Y.S.2d 810 (3d Dep't), *leave to appeal denied*, 91 N.Y.2d 802, 667 N.Y.S.2d 682, 690 N.E.2d 491 (1997). This would tend to negate the reasonableness of any alleged reliance. *See LaDuke*, 239 A.D.2d at 753, 657 N.Y.S.2d 810.

Because Plaintiff has failed to demonstrate that the *Weiner* factors are present here, her breach of contract claim also must be dismissed.

## III. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are GRANTED and Plaintiff's Complaint is DISMISSED IN ITS ENTIRETY.

**IT IS SO ORDERED.**