**Albert GALLO, Plaintiff,**

v.

**EATON CORPORATION, Defendant.**

**No. 3:97CV2102AVC.**

United States District Court,
D. Connecticut.

Nov. 16, 2000.

---

Robert P. Preuss, Abate & Preuss, New York, NY, for Plaintiff.

Glenn A. Duhl, Siegel, O'Connor, Schiff & Zangari, Hartford, CT, George J. Kelly, Jr., Siegel, O'Connor, Schiff & Zangari, New Haven, CT, Julia A. Davis, G. Ross Bridgman, Michael C. Griffaton, Vorys, Sater, Seymour & Pease, Columbus, OH, for Defendant.

### RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COVELLO, Chief Judge.

The plaintiff, Albert Gallo, has brought this action for damages and injunctive relief against the defendant, Eaton Corporation ("Eaton") pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, and common law tenets concerning breach of contract, defamation, and wrongful discharge/demotion in violation of public policy. Eaton brings the within motion pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that there are no genuine issues of material fact, and that it is entitled to judgment

as a matter of law with respect to portions of counts one and two, and counts two through six in their entirety.

The issues presented are whether: 1) Gallo has provided enough evidence to show a continuing violation, thereby excusing his failure to file a timely charge of discrimination under the ADA's 300 day statute of limitations; 2) Gallo has produced evidence of a causal connection between his protected activity and his termination so as to satisfy his prima facie case with respect to his retaliation count; 3) Gallo has raised a genuine issue of material fact regarding Eaton's wrongful discharge of him in violation of the public policy embodied in the Major Frauds Act, 18 U.S.C. § 1031; 4) Connecticut law recognizes a cause of action for wrongful demotion in violation of public policy; 5) Gallo has raised a genuine issue of material fact as to whether: (a) Eaton defamed him by circulating a disciplinary letter to upper level management and, if it did, (b) whether its conduct was privileged; 6) Eaton's employee manual established an implied contract; and 7) Gallo has raised a genuine issue of material fact regarding his failure to mitigate his damages following his layoff in 1998.

As set forth in more detail below, the court concludes that: 1) Gallo's failure to accommodate action is time-barred as he has not set forth facts sufficient to establish a continuing violation; 2) Gallo has not produced sufficient evidence of a causal connection between his protected activity and his termination so as to satisfy his prima facie case of retaliation; 3) Gallo has raised a genuine issue of material fact concerning Eaton's wrongful termination of his employment in violation of the public policy embodied in the Major Frauds Act; 4) the Connecticut Supreme Court would not recognize the tort of wrongful demotion in violation of public policy; 5) Gallo has raised a genuine issue of material fact that precludes summary judgment as to his defamation action; 6) Eaton's employee manual did not establish an implied

contract because Eaton effectively disclaimed any intention on its part to alter its at-will employment relationship with Gallo; and 7) Gallo has raised a genuine issue of material fact regarding his failure to mitigate his damages following his layoff in November 1998.

With respect to the allegations of direct discrimination contained in count one of Gallo's amended complaint, the court directs the parties to the accompanying order granting in part and denying in part Gallo's motion for clarification [document 62]. In light of that order, the court denies Eaton's motion for summary judgment as to the allegations of direct discrimination contained in count one, without prejudice to its refiling on or before January 5, 2001.

Accordingly, Eaton's motion for summary judgment (document no. 58) is GRANTED as to counts four and six and DENIED as to counts three and five. To the extent that count one alleges an ADA violation predicated on Eaton's failure to accommodate, Eaton's motion is GRANTED. To the extent that count two alleges retaliation based on Gallo's filing of a charge of discrimination, Eaton's motion is GRANTED.

### FACTS

Examination of the complaint, affidavits, pleadings, exhibits, supplemental materials, and Rule 9(c) statements discloses the following undisputed material facts:

### The Parties

The plaintiff, Albert Gallo, is a resident of Connecticut. The defendant, Eaton, is an Ohio corporation that maintains a plant in Danbury, Connecticut. Eaton is a leading supplier of high performance, high technology instrumentation and control equipment to the United States Navy. Because Eaton provides products and services to the federal government, the law requires that it comply with government contracting regulations. Eaton must take all necessary steps to assure that its em-

ployees adhere to certain cost-charging practices because it frequently undergoes government audits. If Eaton is found to have improperly charged the government in connection with one of its contracts, it subjects itself to serious penalties.

Eaton employed Gallo from 1977 until November 27, 1998. At various times since he began working for the company, Gallo has suffered from, and been treated for, depression.

In 1989, Eaton promoted Gallo to the position of manager of contracts for Eaton's Danbury plant. In that position, he was a member of the plant's upper-level management who reported directly to the plant manager, one Kevin Cummings. Gallo was responsible for "the estimating system, proposal system, quoting system, and for how the plant maintained correspondence during the term of a contract." The primary function of his job was to "manage all contract administration functions and provide coordination for activities necessary to satisfy customer purchase orders/contract requirements in line with the achievement of sales and financial goals[, and to] [p]erform marketing efforts to enhance market share with existing customers and develop additional ones."

### Gallo's January 1994 Performance Review with Cummings

In January 1994, during his performance review for the year 1993, Gallo provided Cummings with a two-page statement outlining Gallo's dissatisfaction with, among other things, Cummings' management and Gallo's own job performance. In that statement, Gallo made the following pronouncement: "I have had a problem with depression for several years, but lately it has been worse to the point that I have been on medication for the last few months." The statement went on: "I'm having a difficult time dealing with my life and at times it is very hard to maintain the appearance of a functioning person." During the evaluation, Gallo requested that Cummings include the statement in Gallo's personnel file, but Cummings advised him

against it because the statement gave "a very negative presentation of [Gallo], which could be possibly held against him if he applied for another position."

From January 1994 to July 18, 1996, Gallo continually "pushed" for the creation of two new positions, a program manager and a sales manager, which he believed would have accommodated his depression. During this time, however, Gallo did not tie these requests to his depression because he felt, based on Cummings' statement, that any attempt to seek an accommodation would adversely affect his career. From 1994 to July 18, 1996, in response to these requests, Cummings submitted to Eaton "strategic plans for the plant that included a request for $100,000 for a sales manager position[,] [however,] [t]his request was never granted by senior Eaton management ... until 1996." Cummings also refused to create a program manager position to help control the Class 32 line because he "believed that Gallo was the best person to head up the efforts to launch [that line]."

### The Investigation of the Danbury Plant's Cost–Charging Practices November 1994 – July 1996

In November 1994, Eaton named one Edward Bartlett as its manager of nuclear operations. In that position, Bartlett became responsible for all Navy nuclear operations in both Milwaukee, where Eaton maintained another plant, and Danbury, where Gallo worked.

In November 1995, Bartlett suggested that Gallo meet with one David Woodward, the manager of contracts in Milwaukee. Bartlett expected that Woodward and Gallo would work together to "review common practices between the Milwaukee and Danbury plants and determine which different practices could be imported from one plant to the other." When Gallo and Woodward finally met that month, they engaged in a "broad conversation regarding bid and proposal (B & P) costs and research and

development (R & D) costs."[1] During their conversation, Woodward inquired as to how Gallo kept B & P and R & D charges at Danbury so low, as a percentage of Danbury's overhead. The parties differ as to how Gallo responded to Woodward's query. Eaton maintains that Gallo told Woodward that the Danbury plant charged B & P and R & D costs to contracts. Gallo contends that he never told Woodward that the Danbury plant improperly charged such costs.

Shortly after that meeting, Woodward relayed the substance of their conversation to Bartlett, who testified that Gallo's explanation for improper cost-charging sounded inappropriate "because anyone who puts charges in the wrong classification may be committing mischarging which is a federal crime when committed on government contracts." Bartlett ultimately contacted Eaton's in-house counsel for government contracts, Robert Pohto. "Eaton's practice is to conduct a thorough investigation whenever someone makes an allegation involving illegal or potentially illegal activity."

In February 1996, as a result of Woodward's and Bartlett's November 1995 discussion, Eaton began an investigation into the Danbury plant's billing practices as allegedly represented by Gallo. Eaton conducted the investigation using its own internal auditors who worked under one Frederic Levy, an attorney from the Washington D.C. firm of McKenna & Cuneo, and a specialist in the law controlling government contracting. "During the course of this investigation, Levy and the auditors interviewed Gallo, other senior managers, and various employees at the [Danbury] plant." The investigation revealed that some engineers had charged labor time to B & P when they should have charged that time to a contract. Eaton

maintains that this practice constituted a cost-charging violation.

One example of this improper charging occurred as follows: An Eaton supervisor, Bob Rossamondo, noticed that an engineer working under him, Nick Graziano, had charged labor time to a B & P number when he should have charged that time to a contract number. Rossamondo instructed Graziano to obtain the proper charge number from Gallo. Gallo obliged. The parties are in dispute regarding whether Gallo was ultimately responsible for ensuring that an engineer like Graziano charged the proper B & P, R & D, or contract number. Gallo maintains that his only obligation was to provide Graziano with the correct number when a mistake was brought to Gallo's attention. He asserts that he was not responsible for ensuring that all of Graziano's *previous* charges were correct. Gallo insists that company policy required that Graziano's supervisor review these charges. Eaton, on the other hand, maintains that Gallo should have confirmed that all of Graziano's earlier charges on that project were accurate and that his failure to do so was a violation of company policy.

Another example of an alleged cost-charging violation occurred when certain displays that Eaton purchased for a bid and proposal, and charged to a B & P number, ended up in actual hardware sold to a customer as part of a contract. Evidently, someone at Eaton should have transferred the cost of those displays from the B & P number to the contract number. As of the time of the audit, however, no one had transferred the costs associated with these displays. Gallo and Cummings approached an Eaton accountant and requested that he perform the required analysis and track down the costs. Both Gallo and Eaton acknowledge that these costs needed to be transferred, but Gallo main-

---

1. B & P costs are costs that Eaton would incur in preparing, submitting, and supporting bids and proposals on potential government or non-government contracts. R & D costs are those that "are not sponsored by or required in performance of a contract and that pertain to basic research, applied research, development of specific requirements, and other concept formulation studies."

tains that the failure to transfer the costs was not improper until the costs were ultimately charged to the government. To the contrary, Eaton insists that this failure to transfer constituted an improper charging practice and a violation of company policy.

On June 12, 1996, Levy presented the findings of his investigation in a document entitled "Report of Investigation of Cost Charges at the Pressure Sensors Division of Eaton Corporation in Bethel, Connecticut" (Levy Report). The Levy Report charged Gallo with nonfeasance in connection with his failure to follow up on cost-charging irregularities at Danbury, stating that:

> [t]hese improper charges ... do not appear to have stemmed from any deliberate effort to overcharge the government or for other illicit purposes. Rather, they were the result of a combination of new proposal practices stemming from [Eaton's] efforts to sell off-the shelf items, indifference to appropriate charging practices, and lack of understanding of complex technical charging issues.

In the final paragraph of the report, Levy concluded that "[i]ronically, the person principally responsible for these mischarges was Al Gallo, the same person who made the allegations which triggered the review." At least three upper managers at Eaton reviewed the Levy Report. After consulting with counsel, these managers decided that Eaton should discipline Gallo, Cummings, and the Danbury plant controller. Accordingly, Eaton demoted Gallo and Cummings, and the plant controller chose to resign.

### Eaton's Employee Manual

Prior to July 18, 1996, Gallo received and "flip[ped] through" Eaton's *Benefits and Policies Manual.*[2] "[W]hen updates came, [Gallo] would put the updates in and just try to get the flavor of what the update did[.]" Under the heading *Termination,* the manual provides:

> You must understand that your employment is for no definite period of time and that just as you may terminate your employment at any time without notice or cause, so too may [Eaton] terminate or modify the relationship at any time without notice or cause.... In no fashion does this handbook or anything else presented to you in written or verbal form serve as a guarantee of future employment with the [Eaton].

Under the section of the manual entitled *Disciplinary Process,* the manual lists various types of conduct which would "force [Eaton] to take disciplinary action up to and including discharge." This section expressly states that the listed conduct "is not exhaustive, but merely representative." The section goes on to provide that the types of conduct listed "are not the only grounds for discharge and [that] this handbook does not create a contractual relationship."

### The July 18, 1996 Disciplinary Letter

On July 18, 1996, Bartlett sent Gallo a disciplinary letter, which informed Gallo of his demotion and the reasons supporting it. The letter provides, in pertinent part, as follows:

> As a result of [Eaton's] investigation, it was determined that you participated in certain cost charging practices contrary to [Eaton's] policy. These activities included providing inaccurate time charges to certain employees working on programs for which you had administrative responsibility, improperly charging material costs, and failing to take appropriate corrective actions when you became aware of inaccurate cost charging.

---

**2.** The parties do not dispute that Gallo received the manual, but neither one expressly states *when* he received it. For Gallo to maintain his cause of action for breach of an implied contract based on the language contained in the manual, he must have received it before his demotion on July 18, 1996. For the purposes of the motion, the court presumes that he received it prior to the date of his demotion.

This conduct is a serious breach of [Eaton's] policy.

Eaton disseminated this letter only to "those with a legitimate business need to know[.]" This group of individuals may have included upper level managers at Eaton.

The parties dispute whether some or all of the infractions discussed in the letter are true. Eaton maintains that Gallo had failed to take "corrective action" when he became aware of inaccurate cost charging. Gallo, however, maintains that it was not his responsibility to take such corrective action at all times. Cummings, Gallo's supervisor, indicated that he "would not have regarded it as being [Gallo's] responsibility to follow up on [an engineer's improper charges] to make sure [the engineer] change[d] other time sheets." Also, Bartlett, who authored the disciplinary letter, has testified that "[Gallo] was not responsible [for] review[ing] the individual time sheets in the engineering department."

The parties also dispute whether Gallo "provid[ed] inaccurate time charges to certain employees working on programs for which [he] had administrative responsibility[.]" Eaton maintains that, with regard to one specific Navy project, Gallo erroneously told engineers to charge a B & P number when he should have instructed them to charge a contract number. Gallo, however, insists that his method of charging the specific costs to B & P when he did was appropriate. Levy, who issued the report, acknowledged during his deposition that Gallo's charging such pre-contract work to B & P would have been correct even if Gallo had taken out a contract number on the project. Levy also conceded that he did not know whether it was before or after Gallo took out the contract number that Gallo had told the engineers to charge their labor to B & P.

### Gallo's Tenure at Eaton Following His Demotion—July 1996 to November 1998

On September 23, 1996, two months after receiving his disciplinary letter, Gallo became a "program manager in charge of internal transfer work." In that position, his supervisor was one Paul Messier.

On October 31, 1996, Gallo filed a charge of discrimination (Charge No.1) against Eaton with the Equal Employment Opportunity Commission ("EEOC"), alleging that Eaton had discriminated against him by, *inter alia*, failing to accommodate him and demoting him because of his disability.

On December 12, 1996, Gallo nominated himself for the position of program manager of the Class 32 line.

On December 19, 1996, Eaton informed Gallo that it could not consider his self-nomination because Eaton's employee manual required an employee to "function in a newly acquired position for a minimum of [six] months before becoming eligible to self nominate for a new position[.]" On December 19, 1996, Gallo had not been in his then present position for six months. In addition, Bartlett wanted to hire an individual with an MBA who "understood marketing in a different environment, . . . could do market research, [and] prepare a business plan[.]"

On February 1, 1997, Gallo took a medical leave.

On August 4, 1997, six months later, Gallo returned from his medical leave. Before returning, however, he did not call anyone at Eaton to discuss what job he would take upon his return. When he did report back to work on that day, Eaton assigned him to be a program manager in the nuclear controls line.

On October 3, 1997, Gallo filed the instant lawsuit alleging, *inter alia*, that Eaton had violated the ADA.

In December 1997, Eaton reorganized the plant functions and program manager positions so that Gallo and the other program managers in the nuclear controls line began reporting directly to Woodward.

In January 1998, the internal structure at Eaton changed such that Woodward

began reporting directly to one Tom O'Connell, an individual who Eaton hired from outside the company as the division's sales and marketing manager.

### Gallo's Layoff

In early 1998, Woodward and O'Connell conducted a study and projected a 35% to 40% decline in business in its Nuclear Product line. Gallo disputes this projection. Immediately after making this projection, the two determined that Eaton needed to lay off one of its four Nuclear Product line program managers at the Danbury plant. After taking recommendations from Woodward and Bartlett, O'Connell chose to lay off Gallo.

In September 1998, O'Connell informed Gallo of his imminent layoff.

On November 27, 1998, Eaton officially terminated Gallo's employment.

Since Gallo's layoff on November 27, 1998, "[he] has not looked for employment ... at all." He has, however, "gradually [built] up a computer business as his anxiety and depression allow." This business entails web site development.

On June 23, 1999, Gallo filed a second charge of discrimination with the EEOC (Charge No. 2), asserting that Eaton had terminated him in retaliation for filing the instant lawsuit in October 1997 and his earlier Charge No. 1 in October 1996.

On July 2, 1999, Gallo received a right to sue letter from the EEOC regarding Charge No. 2.

On September 17, 1999, this court granted Gallo's motion to amend his complaint permitting him to add, among other things, a count for retaliatory termination.

On December 26, 1999, Eaton advertised for a senior project engineer for the same program that Eaton terminated Gallo from in November 1998.

### STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of materi-al fact in dispute, and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

### DISCUSSION

**I. Count One—Failure to Reasonably Accommodate**

Eaton first argues that Gallo's failure to accommodate action under the ADA is untimely and therefore barred. Specifically, Eaton asserts that Gallo bases his failure to accommodate count on "a single conversation in January 1994 where [Gallo] told Cummings, his supervisor, of his depression and its purported impact on his job performance." Eaton contends that more than 300 days passed between the time of that conversation and the date on which Gallo filed Charge No. 1, October 31, 1996. Gallo responds that the 300 day filing requirement "was extended by the ongoing nature of the discrimination against [him]."

■ An employee complaining of an ADA violation must file a charge of discrimination with a state agency within 300 days of the alleged discriminatory conduct. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also* 42 U.S.C.

§ 12117(a). "When a plaintiff experiences a continuous practice and policy of discrimination, however, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994) (internal quotation marks omitted). Specifically, where a continuing violation is shown, a court "may consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996) (internal citations omitted). The second circuit has held that the continuing violation exception applies where:

> there is evidence of an ongoing discriminatory policy or practice, such as the use of discriminatory seniority lists or employment tests. Although discrete incidents of discrimination that are not the result of a discriminatory policy or practice will not ordinarily amount to a continuing violation, "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice" a continuing violation may be shown.

*Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d at 713. (internal citations omitted).

In determining whether "specific and related instances of discrimination" amount to a discriminatory policy for the purposes of the continuing violation exception, the second circuit has observed that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir. 1993); *see also Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999) ("continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act").[3]

■ Here, the record does not warrant the application of the continuing violation exception. Gallo bases his failure to accommodate claim on his conversation with Cummings in January 31, 1994.[4] To satisfy the 300 day filing requirement, then, the law required Gallo to file his charge by November 27, 1994, at the latest. Gallo has not alleged facts supporting a formal discriminatory policy or practice at Eaton, such as employment tests or seniority lists. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d at 713. Similarly, he cannot point to "specific and related instances of discrimination" that Eaton allowed to "continue unremedied" which would justify a reasonable trier of fact in finding that such a policy or practice existed at the company. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d at 713. Instead, Gallo has vaguely asserted that "[w]hile not relating them to his depression, in the period from 1994 ... until July 18, 1996 ... [he] continually pushed for the creation of two new positions which he believed would have accommodated his depression." This vague assertion will not defeat Eaton's

---

**3.** In light of this admonishment, courts have consistently found, even at the summary judgment stage, that discrete discriminatory acts, including repeated failures to promote and multiple demotions, do not constitute a continuing violation. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997) (repeated demotions and denials of pay grade increases do not amount to continuing violation); *Meckenberg v. New York City Off–Track Betting,* 42 F.Supp.2d 359, 372 (S.D.N.Y. 1999) (multiple instances of failure to promote did not satisfy "continuing violation" exception at summary judgment stage); *Nicholas v. Nynex, Inc.,* 974 F.Supp. 261, 268–69 (S.D.N.Y.1997) (repeated failures to promote failed to qualify under continuing violation exception); *Sunshine v. Long Island Univ.,* 862 F.Supp. 26, 29 (E.D.N.Y.1994) ("to qualify as a series of related acts, the events ... must not be isolated and sporadic outbreaks of discrimination, but a dogged pattern[ ]")

**4.** For the purposes of this motion only, the Court will presume that Gallo's conversation with Cummings took place on January 31, 1994, as this is the date on which Gallo signed his performance evaluation.

motion for summary judgment. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997) ("Although the mere allegation of the existence of [a discriminatory policy or practice] would be sufficient to withstand a challenge for failure to state a claim, something more is required to avoid summary judgment[ ]"). Accordingly, Eaton's motion for summary judgment as to count one is granted, to the extent that it alleges a failure to reasonably accommodate in violation of the ADA.

## II. Count Two—Retaliation

Eaton next argues that it is entitled to summary judgment as to the retaliation count because Gallo has not satisfied his prima facie case and because he has failed to show pretext. Specifically, Eaton asserts that "there is no causal link between Gallo's layoff on November 27, 1998 and his filing [Charge No. 1] on October 31, 1996—25 months earlier." As described in more detail below, Gallo responds that "there is more than enough evidence ... to support a causal connection."

"To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse action." *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir.2000) (internal quotation marks omitted). The plaintiff's burden of proof at the prima facie stage is *"de minimis." Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995).

With regard to the fourth element, a plaintiff can establish "[p]roof of a causal connection ... directly through evidence of retaliatory animus directed against [him], or indirectly by showing that the protected activity was followed closely by the discriminatory treatment, ... or through other evidence such as disparate treatment of fellow employees who en-

gaged in similar conduct." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 447 (2d Cir.1999) (internal quotation marks and citation omitted). "Mere temporal proximity alone will not necessarily satisfy this requirement." *Rizzo–Puccio v. College Auxiliary Serv., Inc.*, 71 F.Supp.2d 47, 60 (N.D.N.Y.1999), *aff'd*, 216 F.3d 1073, 2000 WL 777955 (2d Cir.2000) (citing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85–86 (2d Cir.1990)). Some courts have held that a substantial time lapse between an employee's protected activity and the adverse employment action is counter-evidence of any causal connection between the two for the purposes of a retaliation action. *See, e.g., Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 480 (7th Cir.1995) (concluding that twenty month gap between protected activity and termination discounted evidence of causal connection).

■ Gallo cannot satisfy his prima facie case because he failed to show a causal link. The twenty three months between Gallo's filing of Charge No. 1 and the September 1998 notice of his imminent layoff does nothing to help Gallo satisfy this element. *Cf. Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84–85 (2d Cir.1990) (affirming summary judgment for employer based on lack of causal connection where three months separated complaint and adverse action). In fact, under *Johnson v. University of Wisconsin–Eau Claire*, the two year lapse works to his disadvantage in attempting to show some causal connection between his protected activity and his termination. Setting aside the lack of temporal proximity, the court concludes that the other circumstantial evidence to which Gallo refers also fails to establish a causal link.

First, he argues that after he filed Charge No. 1 in October 31, 1996, the job Eaton assigned him "had no official duties because somebody else was doing the job adequately." The parties, however, do not dispute that Eaton assigned Gallo this "make work" position when he returned to

work on September 23, 1996—over a month *before* he filed his charge. This chronology of events belies any retaliatory animus. *Cf. Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 447 (2d Cir.1999) (causal connection can be shown where "protected activity was *followed* closely by the discriminatory treatment[ ]")

Second, Gallo points to the fact that in December 1996, he applied for a program manager position and was turned down.[5] Eaton states that it did not hire Gallo because: 1) Bartlett determined that Gallo was not the best candidate; and 2) its employment manual requires that an employee to "function in a newly acquired position for a minimum of six months before becoming eligible to self nominate for a new position[,]" and Gallo had not been in his new position that long before applying for the program manager spot. Gallo attempts to raise a genuine issue of material fact by "den[ying] that Bartlett thought [Gallo] was not the best candidate for the job." This attempt suffers from several flaws. First, the parties do not dispute that the job application stated that an "MBA with [m]arketing" was preferred; nor do the parties dispute that Eaton eventually hired an individual with an MBA to fill this position. Gallo's subjective opinions as to who was more qualified are insufficient to show retaliatory animus or create a genuine issue of fact. *Cf. Byrnie v. Town of Cromwell Pub. Schs.*, 73 F.Supp.2d 204, 212 (D.Conn.1999) ("disparity in qualifications must be overwhelming to be evidence of pretext[ ]"). Based on this undisputed evidence, the court concludes that Gallo has failed to establish any "retaliatory animus" on the part of

Eaton and consequently has not shown any causal link.

Third, Gallo argues that in August 1997, Eaton assigned him to a program that was "winding down and would eventually be terminated." This fails to establish "retaliatory animus" for two reasons. First, Gallo has not come forward with any evidence that this assignment was anything but a normal business decision. Rather, Gallo asserts that Eaton "knew [the program] was winding down and would eventually be terminated." This statement, however, is unsupported by any facts in the record and constitutes mere speculation as to what was going through the minds of Eaton management. Such conjecture does not create a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e) ("affidavits shall be made on personal knowledge . . ."); *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) (noting that "mere incantation of intent or state of mind" in discrimination cases cannot defeat summary judgment motion). Second, Gallo's assignment to this position in August 1997 came more than nine months after he filed his charge of discrimination in October 1996. Absent any other evidence of retaliatory motive, mere temporal proximity alone is insufficient. *Rizzo-Puccio v. College Auxiliary Serv., Inc.*, 71 F.Supp.2d 47, 60 (N.D.N.Y.1999). Here, the timing is simply too remote to show a causal connection. *See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84–85 (2d Cir.1990) (no causal connection where three months separated complaint and adverse action).

Finally, Gallo attempts to establish the causal link by stating that, at the time Eaton notified him of his layoff in September 1998, "there was still plenty of work for [him] to do[,]" as evidenced by the fact

---

**5.** In an attempt to connect his October 1996 charge to his September 1998 termination, Gallo has pointed to Eaton's refusal to hire him as a program manager in December 1996. A refusal to hire may serve as the basis for a retaliation action. *See Shah v. New York State Dep't of Civil Serv.*, 168 F.3d 610, 614 (2d Cir.1999). Gallo, however, has not alleged that Eaton retaliated against him by not hiring him into another program manager position in December 1996. Instead, he relies on that failure to hire to establish a causal connection. Gallo has not provided any legal authority showing how this discrete nondiscriminatory act (which Gallo does not argue was discriminatory by itself) connects Gallo's charge and his termination almost two years later.

Eaton had advertised for someone to fill his position one year after his layoff. First, assuming this to be true, the fact that Eaton made this decision two years after Gallo filed Charge No. 1 on October 31, 1996 again militates against finding a causal link. *See Clark v. New York Elec. & Gas Corp.*, 67 F.Supp.2d 63, 77 (N.D.N.Y.1999) (no causal connection where termination followed EEOC charge by nine months). Second, Gallo cannot dispute the fact that Eaton needed to lay off a program manager for the particular program on which he was working. His opposition brief concedes that the termination of the program was "inevitable." While he directs the court to the fact that Eaton advertised for a new senior *project engineer* for that program in early December 1999, he ignores the undisputed fact that Eaton laid him off as a *program manager*, not a *project engineer*. Finally, even if the jobs were similar, Eaton's advertisement came more than three years after his filing of Charge No. 1 and fifteen months after his layoff notice. While this evidence may be relevant for the purpose of showing pretext, to get to that point Gallo must first satisfy his prima facie case. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (noting that plaintiff "[f]irst[ ] . . . must establish prima facie case of discrimination" before moving to pretext inquiry). The court concludes that this relation is too tenuous to achieve that purpose. Because Gallo cannot establish his prima facie case, Eaton's motion for summary judgment as to count two is granted, to the extent that it alleges retaliation based on Gallo's filing of Charge No. 1.[6]

### III. Count Four—Wrongful Discharge in Violation of Public Policy

Eaton next argues that it is entitled to summary judgment as to Gallo's wrongful discharge count because: 1) Gallo failed to plead that "an explicit statutory provision was contravened by Eaton's . . . layoff decision[,]" and 2) "even if Gallo specifically pleaded a clear public policy, the law does not recognize wrongdoers such as [him] who commit malfeasance or nonfeasance." Gallo responds that: 1) state law does not require a plaintiff to plead the specific statute or regulation that constitutes the basis of the public policy claim, and 2) even if Gallo participated in the wrongdoing, his participation does not preclude his bringing a wrongful discharge action.

In *Sheets v. Teddy's Frosted Foods, Inc.*, the Connecticut Supreme Court "recognized a common law cause of action for wrongful discharge in situations in which the reason for the discharge involved 'impropriety . . . derived from some important violation of public policy.'" *Faulkner v. United Technologies Corp.*, 240 Conn. 576, 580–81, 693 A.2d 293 (1997) (quoting *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 475, 427 A.2d 385 (1980)). In doing so, the court carved out a narrow exception to the traditional view that contracts for an indefinite period of time are terminable at the will of either party. *See Somers v. Cooley Chevrolet Co.*, 146 Conn. 627, 629, 153 A.2d 426 (1959). The plaintiff in *Sheets* alleged that his employer dismissed him as quality control director because of his "insistence that [his employer] comply with the requirements of a state statute, the Food, Drug and Cosmetic Act." *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. at 480, 427 A.2d 385. Specifically, the plaintiff had notified his superiors of the company's use of substandard raw materials in its finished products and subsequently recommended that it be more selective in purchasing these materials. *Sheets v. Teddy's Frosted Foods, Inc.*,

---

6. Eaton's motion for summary judgment focuses solely on Gallo's protected activity of filing Charge No. 1 in October 1996. Gallo's amended complaint, however, points to both his October 31, 1996 filing with the agency and his commencement of this lawsuit in December 1997. *See* Amended Complaint at 16, ¶ 60 ("Upon information and belief, the defendant terminated the plaintiff . . . in retaliation for the plaintiff's filing the instant lawsuit[.]").

179 Conn. at 473, 427 A.2d 385. The company ignored these suggestions and, several months later, terminated the plaintiff for "unsatisfactory performance." *Id.* at 473, 427 A.2d 385. In making its ruling, the court observed that someone in the plaintiff's position of quality control director could expose himself "to the possibility of criminal prosecution" under the Food, Drug and Cosmetic Act for permitting the use of noncomplying materials. *Id.* The court ultimately concluded that the plaintiff had stated a cause of action and noted that "an employee should not be put to an election whether to risk criminal sanction or to jeopardize his continued employment." *Id.* at 480, 427 A.2d 385.

■ Similar to the plaintiff in *Sheets*, Gallo has come forward with evidence suggesting that Eaton may have terminated him for his criticism of the company's practices. Under the Major Frauds Act, 18 U.S.C. § 1031, the company's practices could have subjected Eaton and Gallo to liability. Specifically, Gallo points to the Levy Report, which summarized the auditors' findings and concluded that "[i]ronically, the person principally responsible for these mischarges was Al Gallo, the same person who made the allegations which triggered the review." While Eaton finally terminated Gallo twenty-five months later, Eaton has not provided any authority suggesting that this delay defeats a cause of action for wrongful discharge. Whether Eaton terminated Gallo based in part on his triggering allegations is a genuine issue reserved for the factfinder.

Eaton has also argued that Gallo's wrongful discharge claim should be dismissed due to his failure to cite an explicit statutory provision that Eaton's layoff decision contravened. The Connecticut Supreme Court recently stated, however, that *Sheets v. Teddy's Frosted Foods, Inc.* did not "impose[ ] a pleading requirement on plaintiffs alleging wrongful discharge claims that such plaintiffs must plead conclusions of law in their complaints in addition to pleading facts that constitute their

causes of action." *Faulkner v. United Technologies Corp.,* 240 Conn. 576, 588, 693 A.2d 293 (1997). While Gallo did not cite to the Major Frauds Act in his amended complaint, he did refer to "federal regulations" that require companies contracting with the government to "adhere to certain cost-accounting standards[.]" His complaint also articulated Eaton's need to comply with its "responsibility to maintain adequate cost-accounting standards on its government contracts." In light of *Faulkner,* the court concludes that Gallo has alleged sufficient facts to constitute a cause of action under *Sheets.* Accordingly, Eaton's motion for summary judgment as to count four is denied.

## IV. Count Three—Wrongful Demotion in Violation of Public Policy

Next, Eaton argues that it is entitled to summary judgment as to the wrongful demotion count because "Connecticut law does not recognize such a claim." Gallo responds that this court should extend the policy behind the tort of wrongful discharge, embodied in *Sheets v. Teddy's Frosted Foods, Inc.,* to cover wrongful demotions as well.

■ To date, the Connecticut Supreme Court has not recognized a cause of action for wrongful demotion in violation of public policy. "When confronted with an issue of ambiguous or unsettled state law, a federal court 'must do its best to guess how the state court of last resort would decide the issue.'" *Sternberg v. Zuckerman,* 821 F.Supp. 841, 844 (D.Conn.1993) (quoting *In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 850 (2d Cir.1992). When making such a determination, the federal court is not bound by decisions of lower state courts; however, the law requires it to give those decisions "proper regard." *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1190 (2d Cir.1992). "[I]t is entirely proper for the federal court to exercise its own judgment in interpreting state law where neither the state's highest court nor the state's appellate court has

spoken." *See Sternberg,* 821 F.Supp. at 844. As there are no reported Connecticut decisions addressing the issue of wrongful demotion in violation of public policy, this court must exercise its own judgment in determining how the Connecticut Supreme Court would rule on this question.

Given the restricted language used in *Sheets v. Teddy's Frosted Foods, Inc.,* where the tort of wrongful discharge was first adopted, this court concludes that the state's highest court would not extend that cause of action to cover demotions. The policy behind the wrongful discharge exception—that an employee should not be forced to choose between subjecting himself to criminal sanctions and continuing his employment—is an important one, as the *Sheets* court noted. *Sheets v. Teddy's Frosted Foods, Inc.* 179 Conn. at 480, 427 A.2d 385. At the same time, however, the court observes that a state trial court has already refused to extend the policy enunciated in *Sheets* to instances where an employee was allegedly demoted in violation of public policy. *See Jewett v. General Dynamics Corp.,* 1997 Conn.Super. LEXIS 1264, at *4, 1997 WL 255093, at *1 (May 7, 1997) (refusing to extend *Sheets* to cover wrongful demotions). The court is also cognizant of the cautious language used in *Sheets:* "We are mindful that the court should not lightly intervene to impart the exercise of managerial discretion or foment unwarranted litigation." *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. at 477, 427 A.2d 385. Finally, Connecticut Supreme Court decisions subsequently addressing this exception to the general rule governing at-will employment relationships have been careful to underscore its limited purpose. *See Parsons v. United Technologies Corp.,* 243 Conn. 66, 79, 700 A.2d 655 (1997) (noting that court's "adherence to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a *narrow* one") (emphasis added); *Morris v. Hartford Courant Co.,* 200 Conn. 676, 678, 513 A.2d 66 (1986) (stating that issue before court was whether plain-

tiff's cause of action fit within the "*narrow* public policy exception to the general proposition that contracts for an indefinite term of employment are terminable at will[ ]") (emphasis added). In light of the tort's narrow purpose, the court concludes that the Connecticut Supreme Court would not recognize the tort of wrongful demotion in violation of public policy. Accordingly, Eaton's motion for summary judgment as to count three is granted.

## V. Count Five—Defamation

Eaton argues that it is entitled to summary judgment with respect to Gallo's defamation count because: 1) the statements in the disciplinary letter and the Levy report were true, 2) the disciplinary letter was not published, in that Eaton only distributed it to those "who had a legitimate need-to-know," and 3) even if the statements were defamatory and were published, they were "qualifiedly privileged." Gallo responds that there are genuine issues of fact concerning: 1) whether the statements in the disciplinary letter and Levy Report were true, 2) whether Eaton published the disciplinary letter and the Levy Report, and 3) whether Eaton's qualified privilege was defeated because the disciplinary letter and Levy Report were "published with malice or reckless disregard for the truth."

### A. Truth

■ To prevail on a cause of action for defamation, a plaintiff must prove that "the defendant[ ] published false statements that harmed the [plaintiff], and that the defendant[ ] [was] not privileged to do so." *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 27, 662 A.2d 89 (1995) (internal quotations and citation omitted). "In a civil action for libel, where the protected interest is personal reputation, the rule in Connecticut is that the truth of an allegedly libelous statement of fact provides an absolute defense." *Goodrich v. Waterbury Republi-*

*can–American, Inc.,* 188 Conn. 107, 112, 448 A.2d 1317 (1982).

■ Gallo has produced evidence suggesting that the following statements in Bartlett's July 18, 1996 disciplinary letter to him were false:

As a result of [Eaton's] investigation, it was determined that you participated in certain cost charging practices contrary to Company policy. These activities included providing inaccurate time charges to certain employees working on programs for which you had administrative responsibility, improperly charging material costs, and failing to take appropriate corrective actions when you became aware of inaccurate cost charging.

Specifically, Gallo elicited deposition testimony from Bartlett (the author of the letter), Cummings and Pohto indicating that the improper cost-charging practices of which Eaton accused him were not entirely true. While the disciplinary letter stated that certain employees allegedly under Gallo's supervision improperly charged time, Gallo's superiors provided testimony that specifically contradicted this assertion. Also, contrary to statements contained in the letter, the testimony of Cummings and Bartlett reveals that Gallo's practices may have been well within the parameters set by company policy. In light of this evidence, the court concludes that there is a genuine issue of material fact regarding the truth of the statements in the July 18, 1996 disciplinary letter.

### B. Publication

Alternatively, Eaton argues that the court should grant summary judgment on this count because the disciplinary letter was not published; it was only circulated to individuals within the company. The Connecticut Supreme Court recently addressed this argument and found it unavailing: "Although intracorporate communications once were considered by many courts not to constitute 'publication' ... that view has been almost entirely abandoned, and we reject it here." *Torosyan*

*v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. at 27–28, 662 A.2d 89. Based on *Tarosyan,* the court rejects Eaton's argument on this issue and concludes that a reasonable jury could find that the letter was published.

### C. Qualified Privilege

■ Eaton's argument that the communication was privileged and that Gallo will be unable to prove malice or knowledge of falsity is similarly unavailing. "There are two facets to the defense of privilege. The occasion must be one of privilege, and the privilege must not be abused. Whether the occasion is one of privilege is a question of law." *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. at 28, 662 A.2d 89. Whether an employer has abused and consequently lost the privilege, however, depends on whether there "was malice in fact in uttering and broadcasting the alleged defamatory matter." *Id.* at 28, 662 A.2d 89. Malice in this context refers to knowledge of a statement's falsity or reckless disregard for a statement's truth. *See Bleich v. Ortiz,* 196 Conn. 498, 504, 493 A.2d 236 (1985) This inquiry is one of fact and, therefore, reserved for the jury. *See id.* at 501, 493 A.2d 236.

■ As to the first facet of the defense, the court agrees with Eaton and concludes that a qualified privilege existed because Eaton drafted and circulated the disciplinary letter only among those "who had a business need to know[,]". *See Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. at 29, 662 A.2d 89 ("[C]ommunications between managers regarding the ... preparation of documents regarding an employee's termination are protected by a qualified privilege.").

As to the second facet, whether Eaton abused its privilege, however, the court sides with Gallo and finds summary judgment inappropriate. Specifically, the deposition testimony of Bartlett, Cummings

and Levy demonstrates that there is a genuine issue of material fact regarding whether Eaton knew the statements contained in the disciplinary letter were false at the time Bartlett wrote it.

For example, contrary to the assertion in the disciplinary letter that Gallo "failed to take appropriate corrective actions when [he] became aware of inaccurate cost charging," Cummings, who was Gallo's supervisor at the time of the alleged improprieties, testified that he "would not have regarded it as being Mr. Gallo's responsibility to follow up on [an engineer's improper charges] to make sure [the engineer] change[d] other time sheets." The testimony of Bartlett, the author of the disciplinary letter, revealed a similar sentiment. Finally, Levy, who authored the report implicating Gallo in various improper cost-charging practices, acknowledged that certain charging methods that Gallo used were in fact appropriate. Based on a review of the record, the court concludes that there is a genuine issue of material fact as to whether Eaton abused its privilege by placing statements it knew were false in Gallo's disciplinary letter. Accordingly, the Eaton's motion for summary judgment as to the defamation count is denied.

## VI. Count Six—Implied Contract

Eaton next argues that Gallo's breach of contract action must fail because Gallo was "never anything but an at-will employee" at the company. It contends that its disciplinary policy did not alter Gallo's at-will status because the policy explicitly permitted Eaton to discharge Gallo for "acts of gross negligence or misconduct." Eaton also argues that its employee manual contains disclaimers that "unambiguously" state that the document does not create any contractual rights. Gallo responds that "Eaton, by its actions, established a contract agreement with [him] not to take disciplinary action against him [except] for cause" and that if Eaton did take such action, it would do so "only according to

the procedures contained in the Eaton employee handbook[.]" With respect to Eaton's disclaimer argument, Gallo insists that the disclaimers are ineffective because: 1) they do not relate to "lesser forms of disciplinary action such as the demotion [he] suffered," and 2) he did not sign an acknowledgment of the disclaimers until August 19, 1998, over two years after he received his demotion.

"It is firmly established that statements in an employer's personnel manual may ... under appropriate circumstances ... give rise to an express or implied contract between employer and employee." *Gaudio v. Griffin Health Serv. Corp.*, 249 Conn. 523, 532, 733 A.2d 197 (1999) (internal quotation marks and citations omitted). On a motion for summary judgment, "whether [an] ... employee handbook gives rise to an enforceable contract, interpreting all inferences in a light most favorable to the plaintiff" is a question of law for the court. *Lettick v. Nationwide Mut. Ins. Co.*, No. 3:98:CV1928, 2000 WL 863028, at *5 (D.Conn. Mar. 31, 2000) (internal quotation marks and citations omitted). The Connecticut Supreme Court has stated "with unambiguous clarity ... [that] ... employers can protect themselves against employee contract claims based on statements made in personnel manuals by ... (1) eschewing language that could reasonably be construed as a basis for a contractual promise; and/or (2) including appropriate disclaimers of the intention to contract...." *Gaudio v. Griffin Health Serv. Corp.*, 249 Conn. at 535, 733 A.2d 197 (internal quotation marks omitted) (citing *Finley v. Aetna Life & Cas. Co.*, 202 Conn. 190, 199 n. 5, 520 A.2d 208 (1987)).

In the present case, the following disclaimer appears in Eaton's employee manual under the heading *Termination:*

You must understand that your employment is for no definite period of time and that just as you may terminate your employment at any time without notice or cause, so too may [Eaton] terminate

or modify the relationship at any time without notice or cause ... In no fashion does this handbook or anything else presented to you in written or verbal form serve as a guarantee of future employment with [Eaton].

In addition, the section of the employee manual relating to the company's disciplinary policy lists various types of conduct which would "force [Eaton] to take disciplinary action up to and including discharge." This same section expressly states that the listed conduct "is not exhaustive, but merely representative. [The types of conduct listed] are not the only grounds for discharge and this handbook does not create a contractual relationship."

■ Eaton's disclaimers are unambiguous and disavow any intention on its part to alter its at-will relationship with Gallo. *See Finley v. Aetna Life & Cas. Co.,* 202 Conn. at 199 n. 5, 520 A.2d 208 (holding that inclusion of appropriate disclaimers in handbook protects employers against employee contract claims). Gallo does not dispute that he received an employee manual from Eaton; in his deposition, he conceded that when he received it he "flip[ped] through it ... [a]nd then when updates came, [he] would put the updates in and just try to get the flavor of what the update did[.]" While Gallo points out that he did not sign the acknowledgment of the at-will disclaimer until August 1998—two years after his demotion—he has cited no authority standing for the proposition that an express acknowledgment is required. The court observes, however, that neither *Finley* nor *Gaudio* suggest that an employer must expressly acknowledge a disclaimer for it to have any effect. Rather, both those decisions address only the need to *include* such disclaimers or "eschewing language" in the handbook. *See Gaudio v. Griffin Health Serv. Corp.,* 249 Conn. at 535, 733 A.2d 197; *Finley v. Aetna Life & Cas. Co.,* 202 Conn. at 199 n. 5, 520 A.2d 208.

Gallo also argues that the language contained in the discipline section of the manual, because of its placement within that section, only disclaims Eaton's contractual obligation to adhere to its disciplinary policy as applied to discharges, and not to lesser forms of discipline. He reasons, therefore, that his demotion was not covered by the disclaimer and that Eaton's policy obligated it to provide him with the various levels of progressive discipline provided for in the manual. First, this argument ignores the plain meaning of the disclaimer. Regardless of the placement of the disclaiming language, the court concludes that no reasonable jury could find that Eaton's statement—"this handbook does not create a contractual relationship"—failed to cover the entire manual. *Cf. Bead Chain Mfg. Co. v. Saxton Prod., Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314 (1981) ("*Absent* ... definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is ... an inference of fact[ ]") (emphasis added). Second, the discipline section of the manual also states that "[t]he commission of any of the above infractions will be sufficient grounds for disciplinary action ranging from reprimand to immediate discharge, depending upon the seriousness of the offense in the sole judgement [sic] of [m]anagement." Accordingly, Eaton's motion for summary judgment as to count six is granted.

## VI. Gallo's Alleged Failure to Mitigate Damages

Eaton next argues that the court should preclude Gallo from recovering "any damages resulting from his alleged retaliatory layoff because he has utterly failed ... to mitigate his damages by seeking comparable employment." Specifically, Eaton directs the court's attention to Gallo's deposition testimony where he states that "[he] has not looked for employment ... at all." Gallo responds that "there is still a factual issue as to whether he has failed to mitigate damages[,]" maintaining that he is "gradually building up a computer business as his anxiety and depression allow."

Moreover, he asserts that Eaton's treatment of him "left him unable to seek employment in the corporate environment."

 In general, "[v]ictims of employment discrimination are required to mitigate their damages." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir.1998). The law requires a discharged employee to "use reasonable diligence in finding other suitable employment, which need not be comparable to their previous positions." *Id.* "Typically, the employer has the burden to demonstrate that suitable work existed in the marketplace and that [the] former employee made no reasonable effort to find it." *Id.* Recently, however, the second circuit adopted an exception to this burden allocation, which releases the employer "from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d at 54 (ruling, post-trial, that employee failed to mitigate damages where he merely worked for temporary agency and participated in training program in years following his termination).

Here, Gallo has conceded that he has not looked for comparable employment in the corporate environment. The record reveals, however, that he has been spending time on a small consulting business that he and his wife run, which deals with web site development. While his work in this area may not be comparable to his earlier position at Eaton, the second circuit has not made "comparability" a requirement. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d at 53 (noting that discharged employee must use diligence in finding other suitable employment, which need not be comparable to previous positions). Although a fact-finder could find that Gallo's efforts to mitigate may not have been reasonable, the court cannot conclude at this stage that it *must* so find. *See Harrison v. Indosuez*, 6 F.Supp.2d 224, 235 (S.D.N.Y.1998) (denying summary judgment as to mitigation argument and noting that reasonableness of employee's efforts constitutes issue for jury). The court, therefore, denies Eaton's motion for summary judgment as to Gallo's alleged failure to mitigate his damages.

### CONCLUSION

Based on the foregoing, Eaton's motion for summary judgment (document no. 58] is GRANTED in part and DENIED in part.